Redacted Public Version
of Docket No. 43

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (BLS) |
| | ) | |
| | ) | Adv. Pro. Case No. 25-50822 (BLS) |
| BYJU'S ALPHA, INC., | ) | |
| Plaintiff, | ) | **Related Adv. D.I.: 1, 39–40** |
| | ) | |
| GLAS TRUST COMPANY LLC, | ) | |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OCI LIMITED and RUPIN BANKER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEBTOR'S AND GLAS TRUST COMPANY LLC'S OPPOSITION TO
RUPIN BANKER'S MOTION TO DISMISS**

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is:  BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address for purposes of this Chapter 11 Case is:  1007 N. Market Street Ste. G20 452, Wilmington, Delaware 19801.

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Benjamin Finestone (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
Taylor Jones (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
taylorjones@quinnemanuel.com

-and-

Cameron Kelly (*pro hac vice* pending)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
cameronkelly@quinnemanuel.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

*Counsel for Debtor-Plaintiff BYJU's Alpha, Inc.*

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Email:          ljones@pszjlaw.com
                    pkeane@pszjlaw.com

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
Richard U.S. Howell, P.C. (admitted *pro hac vice*)
Ravi Subramanian Shankar (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          patrick.nash@kirkland.com
                    rhowell@kirkland.com
                    ravi.shankar@kirkland.com

-and-

Brian Schartz, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          brian.schartz@kirkland.com

*Counsel for GLAS Trust Company LLC*

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ...............................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.    The Genesis Of The Fraudulent Scheme ...............................................3

    B.    Banker Orchestrates The First Transfer .................................................4

        1.    Banker Negotiates And Structures The First Transfer................................4

        2.    OCI, Camshaft, And The Debtor Complete The First Transfer .................6

        3.    Banker Demands That Camshaft Fund Send $300 Million To OCI...........7

    C.    Banker Orchestrates The Second Transfer ..............................................8

        1.    Banker And Camshaft Plan The Second Transfer .....................................8

        2.    OCI And Camshaft Document And Effectuate The Second Transfer ........9

    D.    OCI And Camshaft Document And Effectuate The Third Transfer......................10

    E.    Plaintiffs' Instant Litigation Claims........................................................10

ARGUMENT .......................................................................................................11

I.    THE COURT HAS PERSONAL JURISDICTION OVER BANKER. ...........................11

    A.    Personal Jurisdiction Exists Under The Traditional Test. ....................11

        1.    Banker Purposefully Directed His Activities At The United States. .........12

        2.    Plaintiffs' Injuries Arise Out Of And Are Related To Banker's Contacts With The United States............................................................16

        3.    The Court's Exercise Of Jurisdiction Over Banker Is Reasonable............16

    B.    Personal Jurisdiction Over Banker Also Exists Under The "Effects Test." ..........18

    C.    Banker Cannot Use OCI As A Corporate Shield...................................20

II.    THE COURT SHOULD AUTHORIZE JURISDICTIONAL DISCOVERY...................24

CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Am. Bd. of Internal Med. v. Rushford*,
2015 WL 5164791 (D.N.J. Sept. 2, 2015) ................................................................14

*Arthur Schuman, Inc. v. Banco Santander Brasil*,
2008 WL 320430 (D.N.J. Jan. 30, 2008) ............................................................12, 14

*AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*,
335 B.R. 309 (Bankr. D. Del. 2005) ................................................................21, 22

*Bickerton v. Bozel S.A. (In re Bozel S.A.)*,
434 B.R. 86 (Bankr. S.D.N.Y. 2010) ........................................................................21

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*,
229 F.3d 254 (3d Cir. 2000)..............................................................................14, 15

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)...........................................................................................12, 16

*Burlington Indus., Inc. v. Maples Indus., Inc.*,
97 F.3d 1100 (8th Cir. 1996) ....................................................................................15

*BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP (In re BYJU'S Alpha, Inc.)*,
2025 WL 659092 (Bankr. D. Del. Feb. 27, 2025) ....................................................17

*Calder v. Jones*,
465 U.S. 783 (1984)...................................................................................................18

*Carteret Sav. Bank, FA v. Shushan*,
954 F.2d 141 (3d Cir. 1992)......................................................................................11

*Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*,
399 B.R. 400 (Bankr. D. Del. 2009) .........................................................................22

*In re DaimlerChrysler AG Sec. Litig.*,
247 F. Supp. 2d 579 (D. Del. 2003)..........................................................................20

*Gambone v. Lite Rock Drywall*,
288 F. App'x 9 (3d Cir. 2008) ..................................................................................18

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*,
988 F.2d 476 (3d Cir. 1993)...............................................................................*Passim*

*In re Gruppo Antico, Inc.*,
2004 WL 5627185 (Bankr. D. Del. Dec. 1, 2004)....................................................15

v

*Harman Auto., Inc. v. Barrincorp Indus., Inc. (In re Harvard Indus., Inc.)*,
    173 B.R. 82 (Bankr. D. Del. 1994) ..................................................................................16

*HarryMax Consultants, LLC v. Benchmark Invs., LLC*,
    Case No. 9:22-cv-81637-DMM (S.D. Fla. Dec. 22, 2022), Doc. 23-1 ......................................3

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)..................................................................................15

*IMO Indus., Inc. v. Kiekert AG*,
    155 F.3d 254 (3d Cir. 1998)..................................................................................20

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..................................................................................11

*Kyko Glob., Inc. v. Bhongir*,
    807 F. App'x 148 (3d Cir. 2020) ...........................................................................14, 15

*Kyko Glob., Inc. v. Prithvi Info. Sols. Ltd.*,
    2020 WL 1159439 (W.D.P.A. Mar. 10, 2020) ...........................................................17, 19, 20

*LaSala v. Marfin Popular Bank Pub. Co., Ltd.*,
    410 F. App'x 474 (3d Cir. 2011) ..................................................................................20

*Marten v. Godwin*,
    499 F.3d 290 (3d Cir. 2007)..................................................................................20

*Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*,
    960 F.2d 1217 (3d Cir. 1992)..................................................................................12

*Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc.*,
    885 F. Supp. 2d 767 (E.D. Pa. 2012) ..................................................................................23

*Metcalfe v. Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009)..................................................................................11

*Mobil Oil Corp. v. Advanced Env't Recycling Techs., Inc.*,
    833 F. Supp. 437 (D. Del. 1993)..................................................................................21

*Newsome v. Gallacher*,
    722 F.3d 1257 (10th Cir. 2013) ..................................................................................20

*Norben Imp. Corp. v. Metro. Plant & Flower Corp.*,
    2005 WL 1677479 (D.N.J. July 15, 2005)..................................................................................23

*Penn. Nurses Ass'n. v. Penn. St. Educ.*,
    90 F.3d 797 (3d Cir. 1996) (Rosenn, J., concurring)..................................................................................17

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002).................................................................................2, 11

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001)..............................................................................12, 19

*Rittenhouse & Lee v. Dollars & Sense, Inc.*,
    1987 WL 9665 (E.D. Pa. Apr. 15, 1987) ...............................................................23

*Seegar v. Anticola*,
    2015 WL 1149537 (D. Del. Mar. 12, 2015) ...........................................................11

*Shuker v. Smith & Nephew, PLC*,
    885 F.3d 760 (3d Cir. 2018)..................................................................................24

*Tigo Energy v. SMA Solar Tech. Am. LLS*,
    2023 WL 6990896 (D. Del. Oct. 23, 2023) ...........................................................17

*Toys "R" Us, Inc. v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003)..................................................................................24

*UD Dissolution Corp. v. Shpere 3D Corp. (In re UD Dissolution Corp.)*,
    629 B.R. 11 (Bankr. D. Del. 2021) ........................................................................22

*Vizant Techs., LLC v. Whitchurch*,
    97 F. Supp. 3d 618 (E.D. Pa. 2015) ......................................................................19

*Walden v. Fiore*,
    571 U.S. 277 (2014)..............................................................................................14

Plaintiffs BYJU's Alpha, Inc. (the "Debtor") and GLAS Trust Company LLC ("GLAS") file this opposition to Defendant Rupin Banker's ("Banker") *Motion to Dismiss* (Adv. D.I. 39), asserting a lack of personal jurisdiction in the United States.[2]

## SUMMARY OF ARGUMENT[3]

Banker played a key role in catalyzing the fraudulent scheme that left the Delaware-based Debtor effectively penniless and unable to meet its obligations to its predominately U.S.-based lenders.  Through this scheme, Banker, OCI, and a host of U.S.-based confederates moved substantially all of the Debtor's cash out of the United States.  To accomplish this fraud, Banker targeted the United States by contacting U.S. residents, enlisting U.S. businesses and advisors, negotiating with U.S. counterparties, and directing the transfer of the Debtor's funds to OCI's bank accounts in the UK.  Banker took these steps knowing full well that he was facilitating breaches of fiduciary duties owed to the Debtor by Riju Ravindran (the Debtor's sole director), T&L (the Debtor's ultimate parent), and Camshaft.  Banker's conduct and the injury to the Debtor flowing from that conduct were centered in the United States, providing this Court with a firm basis for personal jurisdiction over Banker.

The Complaint details Banker's efforts to accomplish this fraudulent scheme through the facilitation of multiple fiduciary breaches.  In early 2022, Banker initiated contact with persons based in the United States.  Banker's goal was to enlist a U.S.-based intermediary through which OCI could execute a transaction effectuating the transfer of $533 million from the Debtor to OCI without alerting the Debtor's lenders.  Once Banker settled on Miami-based Camshaft Fund and

---

[2]    Banker filed *Defendant Rupin Banker's Opening Brief in Support of His Motion Dismiss* (Adv. D.I. 40) to which Plaintiffs will refer together with the *Motion to Dismiss* as the "Motion" or "Mot."

[3]    Capitalized terms not defined herein have the meanings given to them below or in the Complaint (Adv. D.I. 1) (the "Complaint" or "Compl.").

enlisted other U.S.-based advisors, Banker, on behalf of OCI, negotiated the terms and structure of this transaction for months.  During the course of these negotiations, Banker directed emails, text messages, and calls to U.S.-based counterparties and traded draft transaction documents with those counterparties.  At times, Banker even acted as the Debtor's *de facto* agent in the negotiations.  Once the terms of the fraudulent scheme had been finalized, Banker coordinated the execution of agreements effectuating this scheme and directed U.S. residents to wire funds from U.S. bank accounts to OCI's London banks.  Through these acts purposefully directed at the United States, Banker, OCI, and their confederates had stripped the Debtor of substantially all of its assets through a fraudulent scheme carried out in breach of the fiduciary duties owed to the Debtor.

Banker does not attempt to dispute the Debtor's well-pled allegations and the merits of the claims pled against him, which, at this stage, the Court is obliged to accept as true.  *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (on a Rule 12(b)(2) motion, the court must accept plaintiffs' allegations as true and "construe disputed facts in [their] favor").  Instead, Banker advances a handful of legally dubious jurisdictional arguments, contending that his contacts with the United States are insufficient for personal jurisdiction, that the Court cannot exercise jurisdiction over Banker for actions carried out on behalf of OCI, and that it would be unreasonable for the Court to exercise personal jurisdiction over Banker.  The Debtor's allegations and settled Third Circuit law foreclose each of Banker's arguments.

Banker's conduct satisfies both the traditional and effects tests for personal jurisdiction. As the Debtor's well-pled allegations and the evidence offered in support of this opposition demonstrate, Banker repeatedly and purposefully directed his activities toward the United States and injured the U.S.-based Debtor through his intentional tortious conduct.  Contrary to Banker's argument, he cannot escape jurisdiction by hiding behind OCI's corporate shield because he

2

*personally* directed his tortious conduct toward the United States. Banker's U.S.-centered conduct underlies the Debtor's claims against Banker. And Banker offers no legitimate reason why litigating those claims before this Court would be unreasonable.

Accordingly, the Court may properly exercise jurisdiction over Banker. The Motion should be denied.

## STATEMENT OF FACTS

### A.    The Genesis Of The Fraudulent Scheme

In or about March 2022, the Debtor and its guarantors had defaulted on their loan obligations, would soon default again, and days later entered into an agreement with the lenders deferring their obligations. Compl. ¶¶ 49–51. At the same time, and unbeknownst to the lenders, Banker—OCI's "Structuring & Investment Advisor" and a member of its "Senior Leadership Team"—was searching for a U.S.-based intermediary to carry out the fraudulent scheme that eventually gave rise to this action. *Id.* ¶ 58; *id.*, Ex. 2 at 15; Ex. 27 at -240.[4]

As part of his search, Banker contacted his "former business associate" and friend, Florida resident Brett Borgersen, for help "locating a company to act as a facilitator for a transaction between OCI and BYJU's." Aff. of Brett Borgersen ¶¶ 4–5, *HarryMax Consultants, LLC v. Benchmark Invs., LLC*, Case No. 22-81637-DMM (S.D. Fla. Dec. 22, 2022), Doc. 23-1 (the "Borgersen Aff."); *see also* Compl. ¶ 58. The transaction Banker proposed to Borgersen was for "over $300 million." Borgersen Aff. ¶ 4; *see also* Compl. ¶ 58. Borgersen and Banker enlisted the assistance of Robert Forte of the U.S.-based financial services firm E.F. Hutton Group ("E.F. Hutton") and, on or about March 31, 2022, identified a Miami-based "hedge fund"—Camshaft Fund—and its founder, William Morton, to act as the "facilitator" for the fraudulent scheme.

---

[4]    References to "Exhibit" or "Ex." without further identification refer to the Exhibits attached to the *Declaration of Benjamin I. Finestone in Support of Plaintiffs' Opposition to OCI's Motion to Dismiss* [Adv. D.I. 29].

Borgersen Aff. ¶ 6; Compl. ¶¶ 58–59.

Just four days later, on April 4, 2022, OCI (through Oliver Chapman, OCI's CEO) and the Debtor (through Riju) purportedly executed a procurement agreement (the "Procurement Agreement"). *See* Adv. D.I. 25 ¶¶ 15–17 (the "Chapman Decl."); Adv. D.I. 25-1 at 2; Compl. ¶¶ 54. The Procurement Agreement contemplated that, from time to time, the Debtor, which had no material business operations, would "enter into transactions in which [OCI] agree[ed] to buy Product from a supplier … and sell such Product to the [Debtor]." Adv. D.I. 25-1 at 2. For the services contemplated under the Procurement Agreement, the Debtor agreed to pay OCI "an Advance of USD $350,000,000" either "directly" or via the Debtor's "Supply Chain Financier Camshaft Capital LP [*sic*]." Adv. D.I. 25-1 at 4. Despite the Debtor having no material business operations, the parties taking multiple steps inconsistent with the Procurement Agreement, and there being no evidence of OCI ever rendering any procurement services to the Debtor, Banker was supposed to "manage" the "procurement program" contemplated under the Procurement Agreement. Adv. D.I. 24 at 4–5.

**B.    Banker Orchestrates The First Transfer**

Between April and July 2022, Banker enlisted a number of U.S. advisors in addition to Morton and Camshaft Fund, including New York-based transactional counsel, to facilitate the transfer of $533 million; initiated and exchanged dozens of emails, messages, and calls with individuals in the United States concerning the structuring, documentation, and execution of the Transfers; negotiated and approved the U.S.-centered documents governing the Transfers; and directed and facilitated the transfer of U.S.-dollar-denominated funds from U.S.-based banks to OCI's U.S.-dollar-denominated bank accounts in London. Each of these steps is detailed below.

**1.    Banker Negotiates And Structures The First Transfer**

On April 5, 2022, with Morton and his sham hedge fund in place, Forte started an email

4

chain with Banker, Borgersen, Morton, and Jimmy Milliron (a Florida resident who had met Morton at a strip club a few months before) to serve "as the working group" for the cohort Banker had assembled. Ex. 1 at -733; Compl. ¶¶ 58, 60. Around the same time, Morton sent a summary of the "deal" that would become the First Transfer, which was to be forwarded to Banker. Ex. 2 at -825–26; Compl. ¶ 60. Morton's email included his signature block for Camshaft, reflecting a business address in Miami and a U.S.-based phone number. Ex. 2 at -825. According to Morton's summary, the deal would begin with the Debtor investing $200 million in Camshaft Fund and end with it "distribut[ing] capital to OCI without booking an expense," *i.e.*, clandestinely. *Id.* at -826; *see also* Compl. ¶ 60. Shortly thereafter, Morton sent Banker and others various draft transaction documents contemplating a transaction with Florida-based Camshaft Fund that would be governed by Florida law. Ex. 3 at -691, -700, -711. Banker responded, stating he forwarded the documents to the Debtor and legal counsel. Ex. 4 at -781. Banker wrote again a few days later to introduce Morton to OCI's New York-based counsel at Sullivan & Worcester LLP, Jon ("Jay") Jenkins. *Id.* at -779.

Over the following weeks, Banker and Morton negotiated the deal structure through calls and emails, which included their U.S.-based legal counsel. Compl. ¶¶ 61–62. Banker was many times the driving force behind these negotiations. For example, on April 21, 2022, ███████████ ████████████████████████████████████████████████████ ███████████████ Ex. 5 at -338. The next day, Banker emailed ██████████████ ████████████████████████████████ Ex. 4 at -763. Banker then sent █ ███████████████████████████ *Id.* at -762.

On April 26, 2022, Banker asked an OCI employee to ████████████████ ███████████████████ Ex. 6 at -979; *see also* Adv. D.I. 25-1 at 2. After some back and

5

forth, on April 28, 2022, Banker, functioning as the Debtor's *de facto* representative, sent to Morton KYC materials for the Debtor, including a W-9 form showing the Debtor's Delaware registered address along with the Debtor's certificate of incorporation and bylaws, among other materials. Compl. ¶¶ 71, 90; *see* Ex. 8 at -831.

### 2.    OCI, Camshaft, And The Debtor Complete The First Transfer

On or around April 28, 2022, Banker arranged for the Debtor, Camshaft, and OCI to execute four agreements to effectuate the First Transfer of $318 million: (i) the April Subscription Agreement between the Debtor and Camshaft Management; (ii) the April Side Letter between the Debtor and Camshaft Fund; (iii) the Camshaft LP Agreement executed by the Debtor; and (iv) the April Promissory Note executed by Chapman. Ex. 9 at -646–47; Compl. ¶ 64. The DocuSign records associated with these agreements list Banker as the "envelope originator" and "holder" of the fully-executed documents. Ex. 9 at -646. ███████████████████████████████

███████████████████████████████████████████████████████

Ex. 9 at -646–47. █████████████████████████████████████

████████████████    Ex. 9 at -644–46.

These agreements plainly centered the transaction in the United States. As described in the April Side Letter, the Delaware Debtor would "invest" $318 million in Camshaft Fund, a Delaware limited partnership. Compl. ¶ 65. Once Camshaft Fund received the Debtor's "investment," Camshaft Fund would immediately "loan" the $318 million to OCI, with the value of the Debtor's "investment" dependent upon OCI's repayment (or not) of the Promissory Note. *Id.* The Debtor (under former management) used its receipt of the Camshaft LP Interest to disguise on its financial statements that it had transferred $533 million away. *Id.* ¶¶ 65–66, 86–88. Through this arrangement, Banker, along with his confederates, ensured that the transaction they devised would not alert the Debtor's lenders that their money had been fraudulently transferred abroad. *Id.*

¶¶ 6–7, 60.

Moreover, the April Promissory Note:  (i) specified that it was governed by Florida law; (ii) required OCI to consent to jurisdiction in Florida state and federal courts; (iii) required payments to be made in U.S. dollars to a U.S. bank account by the U.S. close of business; (iv) required compliance with U.S. anti-money laundering and anti-competition laws; (v) dictated that U.S. law would govern the enforceability of electronic signatures; and (vi) defined "Business Day" to exclude U.S. bank holidays.  *Id.* ¶ 67.

### 3.    Banker Demands That Camshaft Fund Send $300 Million To OCI

Also on April 28, 2022, Banker sent several emails to ensure that the funds moved from the Debtor to Camshaft and then to OCI.  First, he emailed ███████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████  Ex. 10 at -252.  Second, Banker sent OCI's wire instructions for its U.S.-dollar-denominated Barclays account to ███, copying Morton and Forte, and requesting that $300 million be sent to OCI via wire transfer.  Ex. 11 at -681; Compl. ¶ 71.  Third, Banker sent ███████
████████████████████████████████████████████████  Ex. 12 at -131–32.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████  Ex. 13 at -950.  For his part, Banker continued to do everything he could to get the money.  On May 4, 2022, ██████████████████████████████████
████████████████████████████  Ex. 15 at -009.  He then emailed BYJU's contact

information to Morton to forward onto U.S. Bank. Ex. 16 at -219; *see also* Compl. ¶ 74. The next day, ███████████████████████████████████████████████████ ██████████████████████████████ Ex. 11 at -680.

By May 9, 2022—a week after the transaction closed—Banker approached a boiling point, threatening Camshaft and E.F. Hutton with legal repercussions if the transfer was not promptly completed. Compl. ¶ 75. When the funds still had not arrived the following morning, Banker's agitation increased. He emailed ████████████████████████████ ██████████████████████████████ Ex. 17 at -920. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at -919. Later that day, U.S. Bank finally wired the $300 million out of the United States and into OCI's Lloyds Bank account in London. Compl. ¶ 76.

### C.    Banker Orchestrates The Second Transfer

#### 1.    Banker And Camshaft Plan The Second Transfer

In early June 2022, Banker and his confederates began preparations to "run the same trade back" and effectuate a second transfer of the Debtor's funds to OCI. Ex. 18 at -534; Compl. ¶ 78. Banker again spearheaded the negotiations. On June 3, 2022, Banker told Morton, Forte, Borgersen, and others that he "would have a deal teaser sent across" for "the exact same transaction as the previous one." Ex. 18 at -533; Compl. ¶ 78. On June 8, 2022, Morton emailed Banker recounting the terms of the deal the two had discussed on a call. Ex. 18 at -532. In response, Banker proposed revisions to the terms of the deal outlined by Morton. *Id.*

Banker and Morton then began negotiating the terms of the Second Transfer. ████████████

████████████████████████████████████████████████████

8

 Ex. 19 at -582.    *See generally* Ex. 20.

A few weeks later, on July 7, 2022, Banker emailed Morton in an effort to finalize the next transfer of the Debtor's funds to OCI, informing Morton that OCI was "ready for the next tranche of $150-$200[mm]" and requesting a "quick call to discuss pricing and interest rates." Ex. 21 at -761; Compl. ¶ 78.  Ex. 22.    Ex. 23 at -804.    Ex. 23 at -802–03.    *See, e.g.*, Exs. 24–25.

### 2.    OCI And Camshaft Document And Effectuate The Second Transfer

On July 12, 2022, the Debtor, Camshaft, and OCI executed three related agreements to effectuate the $215 million Second Transfer, all of which Banker received:    (i) the July Subscription Agreement executed by the Debtor; (ii) the July Side Letter between the Debtor and Camshaft Fund; and (iii) the July 12 Promissory Note executed by OCI.    Compl. ¶ 79.    *Riju, Morton, and Chapman were the respective signatories of the Debtor, Camshaft, and OCI.    Id.*

Like the First Transfer, the agreements effectuating the Second Transfer centered the transaction in the United States. *Id.* ¶¶ 80–81.

Between July 12–13, 2022, the Debtor transferred $215 million via three wire transfers out of its Silicon Valley Bank account in California to Camshaft Fund's Northern Trust account in New Jersey.    *Id.* ¶ 82.    Then, on July 14, 2022, Camshaft Fund transferred $190,812,300 from a separate JPMorgan account to OCI's Barclays account.    *Id.*    Banker thus helped facilitate the Debtor's transfer of almost $150 million more to OCI than was contemplated under the Procurement Agreement. *See* Adv. D.I. 25-1 at 4.

**D.      OCI And Camshaft Document And Effectuate The Third Transfer**

Despite having "loaned" OCI more than $500 million, Camshaft Fund and OCI were not finished.  On July 15, 2022, OCI entered into a third promissory note, executed by Chapman, with the same U.S.-centric provisions as the two prior Promissory Notes.  *See* Ex. 26; Compl. ¶ 83. That same day, Camshaft Fund transferred $15,095,150 from its JPMorgan account to OCI's Barclays account (withholding prepaid interest).  Compl. ¶ 83.

**E.      Plaintiffs' Instant Litigation Claims**

As a result of Banker's efforts to effectuate the Transfers, the Debtor lost $533 million, Camshaft received more than $10 million in fees, and OCI received the Alpha Funds, which never were repaid.  *Id.* ¶ 84.  The Debtor was left hopelessly insolvent, having transferred 80% of its cash on hand to Camshaft Fund (and onwards to OCI).  *Id.* ¶¶ 84–85.  On May 5, 2025, the Debtor filed its Complaint (Adv. D.I. 1) asserting four causes of action, three of which are asserted against Banker, summarized as follows:

- Count I is a claim to recover an avoided fraudulent transfer under Sections 544 and 550 of the Bankruptcy Code against OCI for the $533 million transfer that it received (via Camshaft Fund) as a subsequent transferee.

- Counts II–III are aiding and abetting claims under Delaware law against OCI and Banker for their roles in facilitating Riju Ravindran's and T&L's breaches of fiduciary duties to the Debtor for their roles in authorizing and/or directing the Debtor's transfers of the Alpha Funds.

- Count IV is an aiding and abetting claim against OCI and Banker under Delaware law for their roles in facilitating Camshaft Management's (Camshaft Fund's general partner) breach of fiduciary duties to the Debtor, in its capacity as a limited partner of Camshaft Fund, which had a side-pocket LP Interest in Camshaft Fund premised upon the value of the Promissory Notes.

10

## ARGUMENT

## I.    THE COURT HAS PERSONAL JURISDICTION OVER BANKER.

To survive Banker's motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(2), Plaintiffs need only "establish a *prima facie* case of personal jurisdiction" (unless an evidentiary hearing is required, which it is not here). *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (cleaned up) (emphasis added). Under Rule 12(b)(2), the Court is obliged to "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker*, 292 F.3d at 368 (internal quotation marks omitted); *see also Metcalfe*, 566 F.3d at 330 (reversing the district court for failing to take the claimant's facts as true when evaluating the Rule 12(b)(2) motion to dismiss). The Court "may rely upon matter outside the pleadings in determining jurisdictional facts." *Seegar v. Anticola*, 2015 WL 1149537, at *3 (D. Del. Mar. 12, 2015). Ultimately, jurisdiction must only be shown by a preponderance of the evidence. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992).

This Court has two independent bases to exercise specific personal jurisdiction over Banker. Accordingly, there is no need for the Court to consider the existence of general jurisdiction.

### A.    Personal Jurisdiction Exists Under The Traditional Test.

This Court has specific jurisdiction over Banker if exercising personal jurisdiction comports with constitutional due process requirements, guided by the traditional "minimum contacts" test under *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). Under that test, a court may exercise personal jurisdiction over a non-resident defendant (1) where the defendant "purposefully directed his activities at residents of the forum," (2) his contacts with the forum are sufficient to support personal jurisdiction in any "litigation [that] results from alleged injuries that arise out of or relate to those activities," (3) so long as the exercise of jurisdiction would "comport

11

with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–76 (1985) (cleaned up). This "traditional" test is easily satisfied here.

### 1.    Banker Purposefully Directed His Activities At The United States.

While "even one contact with the forum may be enough," Banker purposefully directed a series of activities at the United States, all of which, either taken alone or together, establish purposeful direction under the first prong of the traditional test. *See Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 480, 484 (3d Cir. 1993) (recognizing that negotiations are sufficient for personal jurisdiction where the suit arises from the effect of such negotiations).

Banker played a key role in the scheme to deprive the U.S. Debtor of substantially all of its assets. Significantly, Banker initiated this scheme when he contacted Borgersen—a Florida resident—to "set into motion a search for a financial institution or other intermediary that could facilitate moving the Debtor's funds to OCI." Compl. ¶ 58. With the help of Borgersen and U.S.-based E.F. Hutton, Banker succeeded in enlisting U.S.-based Camshaft Fund and its founder Morton to act as the intermediary. *Id.*

Notably, the Third Circuit has held that personal jurisdiction exists where, as here, a nonresident solicits a business relationship with a party located in the forum. *See Remick v. Manfredy*, 238 F.3d 248, 256, 264 (3d Cir. 2001) (reversing district court's dismissal for lack of jurisdiction, exercising jurisdiction largely because the defendant had "plac[ed] a telephone call to" his counterparty's (the plaintiff) "associate … at their office in Philadelphia" that "eventually resulted in the fee agreement" between the parties); *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) ("It was the defendants who approached [plaintiff] Mellon and through this contact established a business relationship with a Pennsylvania entity."); *Arthur Schuman, Inc. v. Banco Santander Brasil*, 2008 WL 320430, at *5–6 (D.N.J. Jan. 30, 2008) (specific jurisdiction established where defendant "reached out to Plaintiff in New Jersey to

12

commence the negotiations culminating in the issuance of the SBLC that is the subject of this litigation," which was "quite significant" to the analysis).

Thereafter, Banker continued to play a key role in working with Camshaft and a litany of U.S. advisors to structure the U.S-centric transaction to move hundreds of millions of dollars out of the United States. *See* Statement of Facts § B. In addition to negotiating deal structures through calls and emails with Morton and the parties' U.S.-based legal counsel, Banker at times also functioned as the Debtor's *de facto* representative, sending to Morton the Debtor's KYC and other materials. And once the deal was finalized, Banker coordinated the execution by the Debtor, Camshaft, and OCI of the four agreements effectuating the First Transfer—a transaction plainly centered in the United States—as well as the actual transfer of the funds originating from the Debtor's account, through Camshaft's account, to OCI. And when the transfer was delayed, Banker threatened Camshaft and E.F. Hutton with legal action if the transfer was not promptly completed. Banker ran through the same playbook again with respect to the Second and Third Transfers.

All told, between April and July 2022, Banker sent ██████████████████ ████████████████████████████████████████ █████████████████████████████ the transfer of more than $500 million of the Debtor's funds to OCI. *See* Ex. 4 at -762–63, -779, -781; Ex. 5 at -338; Ex. 6 at -979; Ex. 8 at -826, -828; Ex. 9 at -574; Ex. 10 at -252–53; Ex. 11 at -680–81; Ex. 12 at -131; Ex. 14 at -177; Ex. 15; Ex. 16; Ex. 17 at -919–25; Ex. 18 at -532–33; Ex. 19; Ex. 21 at -761; Ex. 23 at -802–04; Ex. 24 at 852–854; Ex. 25 at -136. Courts have found personal jurisdiction based on far fewer forum contacts than the numerous contacts Banker had with the U.S. in orchestrating the Transfers. *See, e.g., Grand Ent.*, 988 F.2d at 482 (minimum contacts found where defendant "in

his individual and corporate capacity, directed at least twelve communications to the forum");

*Arthur Schuman*, 2008 WL 320430, at *6 (minimum contacts consisted of "at least eight emails");

*Am. Bd. of Internal Med. v. Rushford*, 2015 WL 5164791, at *4 (D.N.J. Sept. 2, 2015) ("All that

is required … is at least a single deliberate contact with the forum state that relates to the cause of

action.") (citation and quotations omitted).

Banker does not seriously dispute that he initiated contact with persons in the United States

for the purpose of orchestrating the fraudulent scheme, that he continued communicating with

those parties for months in order to structure and negotiate the transaction, or that he personally

ensured the Debtor's funds were transferred from the U.S. to OCI.  Rather, Banker contends that

these contacts are simply insufficient as a matter of law.  Mot. at 8–9.  Apart from the mountain

of contrary authority within the Third Circuit, the cases on which Banker relies are inapposite.

Banker relies on *Walden v. Fiore*, 571 U.S. 277, 285 (2014), to suggest that Banker's

contacts with persons and entities that reside in the United States are insufficient for personal

jurisdiction.  Mot. at 9.  But the Supreme Court in *Walden* was considering whether an illegal

search and seizure (of cash) by a police officer in Georgia against Nevada residents *in a Georgia

airport* could support personal jurisdiction in Nevada.  The Court held that the fact that the

plaintiffs chose to go to Nevada, where they then found themselves in need of cash, did not support

personal jurisdiction of that Georgia police officer in Nevada.  *Walden*, 571 U.S. at 289–90.

*Walden* does not undermine the exercise of personal jurisdiction based on contacts with forum

residents while those residents were within the forum.

Banker also misleadingly cites *Kyko Glob., Inc. v. Bhongir*, 807 F. App'x 148, 152 (3d Cir.

2020), and *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 262 (3d Cir.

2000),[5] to suggest that contacts with persons in the forum are insufficient for personal jurisdiction. Mot. at 9. But the court in *Kyko* declined to find personal jurisdiction where the plaintiff failed to tie the defendant's contacts with a person within the forum to the tortious conduct giving rise to the plaintiff's claims. 807 F. App'x at 152. Here, however, Banker's contacts with the United States relate directly to the aiding and abetting claims asserted against Banker. Compl. ¶¶ 129–33, 145–49, 155–56. The court in *BP Chemicals* held that the defendant's one-off orders placed with U.S.-based companies for services to be rendered in Taiwan did not confer personal jurisdiction over the defendant. 229 F.3d at 261. Here, by contrast, the Complaint includes specific allegations showing that Banker communicated regularly with persons in the United States regarding transactions centered in the United States.[6]

At bottom, Banker purposefully directed his activities toward the United States, a fact he does not (and at this stage of the proceeding, may not) seriously dispute. Based on these activities, the Court's exercise of personal jurisdiction over Banker is proper.

---

[5]   Banker's citation to *BP Chemicals* is particularly misleading. Banker deploys the citation to suggest that the Third Circuit held that one hundred telephone calls between the defendant and vendors within the forum were insufficient for personal jurisdiction. Mot. at 9 (citing *BP Chemicals*, 229 F.3d at 262). However, the quotation on which Banker relies is not the holding of the *BP Chemicals* court, rather it is a description of a holding from the Eighth Circuit. *BP Chemicals*, 229 F.3d at 262 (citing *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996)). Moreover, the Eighth Circuit simply held that telephone calls between the defendant and the plaintiff were in and of themselves insufficient to confer personal jurisdiction over the defendant. *Burlington*, 97 F.3d at 1103. The Eighth Circuit did not address the quality of the *Burlington* defendant's contacts and noted that "[s]imple commercial contacts, unrelated to [the plaintiff's claims] are insufficient to establish personal jurisdiction." *Id.* Here, however, Banker repeatedly and proactively reached into the United States in order to effectuate the fraudulent scheme underlying Plaintiffs' claims.

[6]   Banker contends that OCI's receipt of transfers from the United States as a result of Banker's actions does not support the Court's exercise of personal jurisdiction. Mot. at 8 (citing *In re Gruppo Antico, Inc.*, 2004 WL 5627185, at *3 (Bankr. D. Del. Dec. 1, 2004)). However, Banker supports his argument with *Gruppo Antico*, a case involving "unilateral" payments by the plaintiff to the non-resident defendant. 2004 WL 5627185, at *3–4 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)). But the transfers to OCI here were anything but "unilateral"—they were carefully negotiated and orchestrated by Banker on behalf of OCI, the party receiving the Transfers.

**2.      Plaintiffs' Injuries Arise Out Of And Are Related To Banker's Contacts With The United States.**

Tellingly, Banker does not address the second part of the traditional minimum contacts test—that Plaintiffs' injuries arise out of Banker's contacts with the United States.  As he therefore tacitly concedes, each and every one of Banker's contacts with the United States was designed to facilitate the Transfers that stripped the Debtor of its assets, placing them beyond the reach of its largely U.S.-based creditors.  Banker's actions aided and abetted Ravindran's breach of his fiduciary duties as the Debtor's director and officer (Count II), T&L's breach of its fiduciary duties as the Debtor's ultimate corporate parent with exclusive control and authority over the Debtor (Count III), and Camshaft's breach of its fiduciary duties to its limited partners, including the Debtor (Count IV).  Thus, Banker's contacts "give rise to the litigation," and the second prong is met.  *Grand Ent.*, 988 F.2d at 483 (finding that foreign defendant's "personal, intentional communications gave rise to the underlying suit").

**3.      The Court's Exercise Of Jurisdiction Over Banker Is Reasonable.**

To defeat jurisdiction, Banker "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.  He does not.

*First*, Banker weakly cites to burdens incumbent on all litigants, but he offers no evidence of these burdens and does not address how they are unreasonable (they are not).  Mot. at 10. Without more, Banker's assertions of unreasonableness fail.  *See Harman Auto., Inc. v. Barrincorp Indus., Inc. (In re Harvard Indus., Inc.)*, 173 B.R. 82, 90 (Bankr. D. Del. 1994) (finding a defendant failed to demonstrate unreasonableness because the defendant did not show that it lacked the resources to fairly litigate the case in a forum in the United States, the United States had an interest in enforcing the state and federal laws at issues, and evidence related to the suit would be located

16

in the United States); *see also BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP (In re BYJU'S Alpha, Inc.)*, 2025 WL 659092, at \*10 (Bankr. D. Del. Feb. 27, 2025) (rejecting foreign defendant's assertion that litigating in the United States would "impose an exorbitant and unreasonable financial burden" because the defendant failed to demonstrate "that the exercise of jurisdiction over it would be unreasonable").

*Second*, the United States, where the injury occurred, has a strong interest in adjudicating this dispute, which is aimed at protecting its corporate citizens and preserving the integrity of capital markets.  *See Penn. Nurses Ass'n. v. Penn. St. Educ.*, 90 F.3d 797, 811 (3d Cir. 1996) ("[The forum] has a substantial interest in protecting the rights of its citizens against the fraudulent and other misconduct.") (Rosenn, J., concurring); *Kyko Glob., Inc. v. Prithvi Info. Sols. Ltd.*, 2020 WL 1159439, at \*30 (W.D. Pa. Mar. 10, 2020) ("Because Pittsburgh appears to be ground zero for the harms alleged, it is just and equitable for this matter be adjudicated in [Pennsylvania].").

*Third*, the Debtor has an interest in holding Banker accountable for aiding and abetting breaches of fiduciary duties owed under U.S. law that resulted in the fraudulent transfer of the Debtor's primary asset.

*Fourth*, this Court's familiarity with this case's long, sordid history will facilitate the efficient adjudication of Plaintiffs' claims.  The claims asserted in this action arise largely from the same facts underlying Plaintiffs' claims against Camshaft and the Ravindran family. Accordingly, "it would be most efficient … for the totality of [the] case … to remain here." *Tigo Energy v. SMA Solar Tech. Am. LLS*, 2023 WL 6990896, at \*10 (D. Del. Oct. 23, 2023) (quoting *bioMérieux, S.A. v. Hologic, Inc.*, 2018 WL 4647483, at \*4 (D. Del. Sept. 26, 2018)).

*Finally*, the interests of the United States in this dispute surpass any other nation.  Here, the Debtor seeks to enforce U.S. prohibitions on breaches of fiduciary duties by Delaware directors

17

and officers.  The aim of this action is the recovery of the Debtor's assets for the benefit of its largely U.S.-based lenders and their U.S.-based agent.  Banker offers no evidence that any other nation has a greater interest in adjudicating this dispute.  *Grand Ent.*, 988 F.2d at 484 ("[T]here is no evidence that another state or nation could better preserve the rights of the litigants or has an interest superior to that of Pennsylvania.").  The shared interests of the several nations therefore favor this Court's exercise of personal jurisdiction in this action.

Based on these reasons, the Court's exercise of personal jurisdiction over Banker is not unreasonable.

**B.     Personal Jurisdiction Over Banker Also Exists Under The "Effects Test."**

Even if Banker's contacts with the United States did not satisfy the traditional "minimum contacts" test (which they do), the Court may still exercise personal jurisdiction over Banker because he committed "an intentional tort outside the forum, the unique effects of which caused damage to the plaintiff within the forum." *Gambone v. Lite Rock Drywall*, 288 F. App'x 9, 14 (3d Cir. 2008).  Personal jurisdiction need not be based on a non-resident defendant's activity within the forum so long as there is "intentional conduct … calculated to cause injury" to plaintiffs in the forum. *Calder v. Jones*, 465 U.S. 783, 791 (1984).

Under the "effect test" established by the Supreme Court in *Calder*, Plaintiffs must demonstrate:

> First, the defendant must have committed an intentional tort.  Second, the plaintiff must have felt the brunt of the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort.  Third, the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

*Gambone*, 288 F. App'x at 14.

Here, all three prongs of the effects test are easily met.  *First*, in Counts II, III, and IV, the

18

Debtor alleges that Banker committed the intentional tort of aiding and abetting breach of fiduciary duty. *See Kyko Glob.*, 2020 WL 1159439, at *10, 30 (applying the effects test to an aiding and abetting breach of fiduciary duty claim). **Second**, as a Delaware-incorporated special purpose vehicle with its principal place of business in Illinois and no material operations other than servicing its term loans, the United States was the predominant, if not exclusive, location of the Debtor's injuries. Compl. ¶ 18; *see Remick*, 238 F.3d at 260 ("[T]he brunt of the harm caused by the alleged intentional tort must necessarily have been felt by Remick in Pennsylvania, as his business practice is based in Philadelphia."); *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 632 (E.D. Pa. 2015) ("It necessarily follows that Vizant felt the brunt of the harm in Pennsylvania such that Pennsylvania can be said to be the focal point of the harm.") (internal quotations omitted). **Third**, Banker "expressly aimed" his conduct at the United States by intentionally facilitating a transfer whereby the U.S. Debtor would transfer its assets to a U.S.-based intermediary (a sham hedge fund) and ultimately to OCI, which were misleadingly papered as loans.

Again, *Remick* is instructive. There, the Third Circuit reversed the district court for failing to exercise jurisdiction over a tortious interference claim, because "the effects of any intentional conduct by the defendants designed to interfere with [the plaintiff] Remick's contractual relations with [the defendant] Manfredy necessarily would have been felt in Pennsylvania," where plaintiff was located. *Remick*, 238 F.3d at 260. Even where plaintiff Remick could not show the defendants "expressly aimed their tortious conduct at Pennsylvania" (unlike here), the "majority of [Remick's] negotiation, consultation, and advice services for Manfredy" were carried out from Remick's Pennsylvania office, thus sufficiently establishing that the "alleged tortious conduct was expressly aimed at injuring Remick in Pennsylvania where he lives and works." *Id.*

19

Like in *Remick*, Banker's intentional tortious conduct was aimed at injuring the Debtor, which Banker knew was a Delaware corporation. Indeed, Banker sent the Debtor's KYC information to Morton, which disclosed that the Debtor was incorporated in Delaware and had a Delaware business address. Compl. ¶¶ 71, 90; *see* Ex. 8. Banker was also presumably familiar with the Procurement Agreement (after all, OCI intended for Banker to "manage" the procurement program), which showed that the Debtor was a Delaware corporation. *See* Adv. D.I. 24 at 9; Adv. D.I. 25-1 at 2. And the ultimate goal of the fraudulent scheme Banker helped orchestrate was to move the Debtor's money out of the United States. *See Newsome v. Gallacher*, 722 F.3d 1257, 1269 (10th Cir. 2013) ("[T]he individual defendants do not contest that they knew Mahalo USA operated exclusively in Oklahoma, making Oklahoma the focal point of any tort against Mahalo USA they may have committed."); *Kyko Glob.*, 2020 WL 1159439, at *2, 30 (finding effects test satisfied where defendants allegedly instructed an executive of a Pennsylvania-based corporation to manage fraudulent transfers within the corporation's Pennsylvania-based bank account).

Jurisdiction is thus proper under the effects test.[7]

### C.    Banker Cannot Use OCI As A Corporate Shield

Banker also contends that the Court cannot exercise personal jurisdiction over him based on contacts that were within "the scope of his corporate capacity." Mot. at 7 (quoting *In re*

---

[7] Banker contends that harm suffered by Plaintiffs within the United States is not sufficient for personal jurisdiction. Mot. at 9. Setting aside that the Supreme Court in *Calder* held to the contrary so long as the harm was the result of tortious conduct expressly aimed at the forum, the cases on which Banker relies did not involve conduct "expressly aimed" at the forum. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 268 (3d Cir. 1998) ("In sum, Imo cannot demonstrate that Kiekert expressly aimed its tortious conduct at New Jersey. Failing this, Imo cannot rely on the *Calder* effects test to confer specific jurisdiction based on Kiekert's allegedly intentional tortious conduct."); *LaSala v. Marfin Popular Bank Pub. Co., Ltd.*, 410 F. App'x 474, 477 (3d Cir. 2011) (declining to find personal jurisdiction based on plaintiff's failure to allege conduct expressly aimed at the forum, and instead rely on alleged knowledge that harm would result in the forum from certain conduct); *Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007) ("[M]arten has not shown with respect to either claim that defendants expressly aimed their conduct at Pennsylvania."). Here, however, Banker "expressly aimed" his tortious conduct at the United States.

*DaimlerChrysler AG Sec. Litig.*, 247 F. Supp. 2d 579, 587 (D. Del. 2003)). Essentially, Banker attempts to avail himself of the "fiduciary shield doctrine," which "immunizes acts performed by an individual in the individual's capacity as a corporate employee from serving as the foundation for the exercise of personal jurisdiction over that individual." *Mobil Oil Corp. v. Advanced Env't Recycling Techs., Inc.*, 833 F. Supp. 437, 440 (D. Del. 1993). However, "the fiduciary shield doctrine is a judicial gloss upon the Delaware long-arm statute, which is irrelevant here," where personal jurisdiction is based on Bankruptcy Rule 7004(f), not Delaware's long-arm statute. *AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 320 (Bankr. D. Del. 2005); *see also Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 99 (Bankr. S.D.N.Y. 2010) ("[The fiduciary shield] doctrine, however, is not relevant to the constitutional due process analysis and relates only to the reach of state long-arm statutes.").

In fact, Judge Walrath's well-reasoned decision in *AstroPower* would all but foreclose Banker's reliance on the "fiduciary shield doctrine." In *AstroPower*, the defendant, a Canadian director and officer of a Canadian corporation, facing fiduciary breach and fraudulent transfer claims arising from his company's sale of stock, sought to avoid personal jurisdiction based on the "fiduciary shield doctrine." *Id.* at 315, 320. Like Banker, the defendant argued that his "communications" with the plaintiff "occurred in his capacity as a corporate officer" of his company. *Id.* at 320. The court unequivocally rejected the defendant's reliance on the "fiduciary shield doctrine" because the doctrine was "a judicial gloss upon the Delaware long-arm statute," while the court's jurisdiction over the defendant was, as it is here, based on Bankruptcy Rule 7004(f). *Id.* at 317, 320.

But even if the "fiduciary shield doctrine" were implicated here, Banker's conduct falls into the well-recognized exceptions to the doctrine. *First*, contrary to Banker's argument,

21

jurisdiction does not rest "solely on his[ ] status as an officer or director of a corporation which commit[ed] a tort within the United States" but is instead based on his own tortious conduct purposefully directed toward the United States. *UD Dissolution Corp. v. Sphere 3D Corp. (In re UD Dissolution Corp.)*, 629 B.R. 11, 25 (Bankr. D. Del. 2021); *see also AstroPower*, 335 B.R. at 321 (finding personal jurisdiction based on an officer's own tortious conduct, which was carried out within the scope of the officer's corporate duties). In *UD Dissolution*, the court exercised personal jurisdiction over two Canadian directors in connection with intentional tort claims asserted against the directors. 629 B.R. at 27. The court's exercise of jurisdiction was based, in part, on allegations that the director's "actions … that were directed at [the plaintiff] in the United States with knowledge that the brunt of the injury would be felt in the United States." *Id.* at 27–28. As in *UD Dissolution*, this Court can exercise personal jurisdiction over Banker based on Plaintiffs' allegations that Banker directed his conduct at the Delaware Debtor's fiduciaries with knowledge that the resulting injury would be felt in the United States. *See, e.g.*, Compl. ¶¶ 129–33, 145–49, 155–56. *Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 399 B.R. 400, 407 (Bankr. D. Del. 2009), likewise confirms this Court's ability to exercise personal jurisdiction over Banker. There, the plaintiff asserted certain fraud claims against an officer of a co-defendant entity that sought to rely on the entity defendant's corporate shield to avoid personal jurisdiction. *Id.* at 407–08. The court rejected the officer defendant's challenge to personal jurisdiction because the officer had "extensive contacts with the United States in order to effectuate" the transaction giving rise to the plaintiff's claims. *Id.* at 408. Banker too had "extensive contacts" with the United States in order to effectuate the fraudulent scheme at issue here. Statement of Facts §§ A–C.

*Second*, Banker acted as a "key player" in OCI's corporate structure and the Transfers at issue, further precluding his reliance on OCI's corporate shield as a means to avert this Court's jurisdiction.  *See Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 783 (E.D. Pa. 2012) (exercising personal jurisdiction over a corporate officer who was a "key player" in the entity defendant's "corporate structure and personally involved in the alleged tort"); *see also Norben Imp. Corp. v. Metro. Plant & Flower Corp.*, 2005 WL 1677479, at *15 (D.N.J. July 15, 2005) (exercising personal jurisdiction over officers defendant based on the officers' "corporate contacts" because the officers' "singlehandedly … forged and maintained the business relationship with" the plaintiff).  *Mendelsohn* is directly on point.  The officer defendant there "handled legal issues of great consequence" for the entity defendant, "had extensive and substantive communication[s]" with the plaintiff in connection with a contractual relationship between the entity defendant and the plaintiff, and was the primary point of contact between the plaintiff and the entity defendant. *Mendelsohn*, 885 F. Supp. 2d at 784–85.  During this course of conduct, the officer defendant directed tortious acts toward the plaintiff within the forum.  *Id.* Accordingly, the court found that the officer defendant was a "key player" in the entity defendant's corporate structure and was personally subject to the court's jurisdiction based on conduct carried out in the officer defendant's corporate role.  *Id.* at 785.  Here too, the allegations in the Complaint show that Banker, on OCI's behalf, was a driver in structuring and negotiating the fraudulent scheme and did so through "extensive and substantive communication[s]" with U.S. based counterparties.  *Id.* at 784; *see also* Statement of Facts §§ A–C.

Based on the purposeful direction of Banker's conduct at the United States and his role as a "key player" in OCI's tortious conduct, Banker "should not be permitted to use the corporate

23

shield to protect himself from liability." *Mendelsohn*, 885 F. Supp. 2d at 783 (quoting *Rittenhouse & Lee v. Dollars & Sense, Inc.*, 1987 WL 9665, at *5 (E.D. Pa. Apr. 15, 1987)).

## II.    THE COURT SHOULD AUTHORIZE JURISDICTIONAL DISCOVERY.

To the extent that the Court is not ready to exercise personal jurisdiction at this stage, it should authorize jurisdictional discovery, "which [the Court] ordinarily allow[s] when a plaintiff's claim to personal jurisdiction is not *clearly frivolous*," as here. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781–82 (3d Cir. 2018) (cleaned up) (emphasis added). As long as Plaintiffs "suggest with reasonable particularity the possible existence" of facts supporting personal jurisdiction, their right to conduct discovery should be sustained. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (internal quotations omitted).

Here, Plaintiffs have alleged and provided evidence that Banker, on behalf of OCI, initiated the transaction in question, Compl. ¶¶ 39, 58–59; made numerous contacts with the United States to negotiate and carry out the transaction, Exs. 1, 3–5, 7–25; intentionally orchestrated the transaction to defraud the Debtor's creditors in the United States, Compl. ¶¶ 56–83; and knowingly aided and abetted Ravindran, T&L, and Camshaft's breaches of fiduciary duties, Compl. ¶¶ 121–58. Plaintiffs have thus "suggest[ed] with reasonable particularity" the possible existence of facts that would support jurisdiction over Banker, and Plaintiffs' jurisdictional claims are far from frivolous. *See Toys "R" Us*, 318 F.3d at 456 (internal quotations omitted).

### <u>CONCLUSION</u>

For all of these reasons, the Court should deny Banker's motion to dismiss.

Dated: September 19, 2025
    Wilmington, Delaware      **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
Taylor Jones (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com
taylorjones@quinnemanuel.com

-and-

Cameron Kelly (*pro hac vice* pending)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
cameronkelly@quinnemanuel.com

*Counsel for Debtor, BYJU's Alpha, Inc.*

25

Dated: September 19, 2025
Wilmington, Delaware

/s/ *Laura Davis Jones*
**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Email:           ljones@pszjlaw.com
                     pkeane@pszjlaw.com

**REED SMITH LLP**
David A. Pisciotta (admitted *pro hac vice*)
Nicholas B. Vislocky (admitted *pro hac vice*)
599 Lexington Avenue, 22nd Floor
New York, New York 10022
Telephone:     (212) 521-5400
Facsimile:     (212) 521-5450
Email:           dpisciotta@reedsmith.com
                     nvislocky@reedsmith.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
Richard U.S. Howell, P.C. (admitted *pro hac vice*)
Ravi Subramanian Shankar (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:           patrick.nash@kirkland.com
                     rhowell@kirkland.com
                     ravi.shankar@kirkland.com

-and-

Brian Schartz, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:           brian.schartz@kirkland.com

*Counsel to GLAS Trust Company LLC*